UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MELINDA NELSON,                                    Civil No. 11-03346 (DWF/FLN)

              Plaintiff,

v.

MICHAEL J. ASTRUE,                     **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

              Defendant.

_____

Ethel J. Schaen, Jean C. Owen, and Andrea S. Stubblefield, for Plaintiff.
David W. Fuller, Assistant United States Attorney, for Defendant.

_____

Plaintiff Melinda Nelson seeks judicial review of the final decision of the Commissioner of

Social Security denying her application for disability insurance benefits and supplemental security

income. The matter was referred to the undersigned for Report and Recommendation pursuant to 28

U.S.C. § 636 and Local Rule 72.1.  This Court has jurisdiction over the claim pursuant to 42 U.S.C.

§ 405(g).  The parties have submitted cross motions for summary judgment. (ECF Nos. 13, 18.)  For

the reasons that follow, this Court recommends the Commissioner's decision be reversed and

remanded for further proceedings consistent with this report and recommendation.

## I. INTRODUCTION

Nelson filed an application for supplemental security income in June 2009 and for disability

benefits in July 2009. Administrative Record [hereinafter "AR."] 199-209, ECF No. 10. Nelson

alleged February 20, 2009 as the onset of her disability.[1] (AR. 73-74.) Her application was denied

_____

[1] Nelson initially alleged an onset date of January 1, 1999, but later amended the date to
February 20, 2009. (AR. 74.)

initially and on reconsideration. (AR. 124, 127.) Nelson then filed a request for a hearing before an Administrative Law Judge ("ALJ"), which was held in May 2011. ALJ Mark Clayton denied Nelson's application for disability benefits. (AR. 14.) Nelson appealed the ALJ's ruling, and in October 2011, the Commissioner denied her request for review. (AR. 1.)

In November 2011, Nelson commenced this action seeking reversal of the ALJ's decision, or alternatively, a remand for further proceedings. (ECF No. 1.) Nelson and the Commissioner now both move for summary judgment. (ECF No. 13, 18.)

## II. STATEMENT OF FACTS

Nelson is a 49 year-old woman and a mother of four children. Her two youngest children still reside with her. Her youngest daughter is seven years old and disabled. Nelson has a general equivalency diploma (GED), and she previously worked as a personal care assistant, a teacher's assistant, data entry clerk and receptionist. (AR. 29, 82, 105.) She claims to be disabled due to her lumbar spine degenerative disc disease, cervical spine degenerative disc disease with spinal stenosis, thoracic spine degenerative disc disease, chronic pain syndrome, mild medical and patellofemoral compartment chondromalacia and arthritis, obesity, major depressive disorder, generalized anxiety disorder, posttraumatic stress disorder and depressive personality disorder with self-defeating borderline personality characteristics. (AR. 19, 20.)

### A.    Medical Opinion Evidence

#### 1. Ms. Dawn Brothers

Dawn Brothers, a physician's assistant (PA), was Nelson's primary-care provider when she began experiencing increased knee and back pain in 2009. In March 2009, Nelson sought medical attention from Brothers for pain in her right knee. (AR. 351.) Upon examination, Brothers noted

abnormalities in Nelson's right knee. (AR. 352.) Several weeks later a magnetic resonance image (MRI) was conducted on Nelson's right knee and revealed "mild medial and patellofemoral chondromalacia"[2] as well as some mild edema and an elongated popliteal cyst. (AR. 340-341.) In June, Nelson returned to Brothers with complaints of increased low back pain. (AR. 355.) Nelson was having problems with her legs giving out and reported that her right leg gave out on her while holding her grandson. (*Id.*) Nelson described her pain level as 9 out of 10 and reported that over-the-counter-medications did not relieve her pain. (*Id.*) Physical examination by Brothers revealed "tenderness to palpate the L4-L5 area as well as the lumbar paraspinals and again the right and left PSIS area." (*Id.*) An x-ray of the lumbar spine was taken, and in the final radiology report, Dr. Angeline Young noted straightening of the lumbar spine, mild degenerative disc disease and endplate spurring. (AR. 350.)

Two weeks later, Nelson returned for a follow up appointment with Brothers. Physical examination revealed generalized back tenderness and some decreased active range of motion (ROM) of the lumbar spine, with flexion and extension secondary to discomfort. (AR. 353.) Nelson had a normal gait and a negative straight leg raise test. (*Id.*) Nelson informed Brothers that she recently attained health insurance and wanted to begin physical therapy again. She also reported that certain activities triggered her back pain, including 'frequent bending, stooping, standing for long periods of time or walking." (*Id.*) Finally, Nelson communicated to Brothers that she did not feel capable of working full, eight-hour days, but thought was able to work half days.

Brothers referred Nelson to physical therapy and gave her work restrictions. The limitations

---

[2] Abnormal softening of the cartilage on the underside of the kneecap. <u>Dorland's Illustrated Medical Dictionary</u>, 1243 and 321 (28th ed. 1994).

recommended by Brothers included the following:

- working no more than 4 hours per day;
- lifting no more than 10 pounds;
- standing or sitting for no more than 20 minutes at a time; and,
- no frequent bending or lifting from the floor for one month following the exam. (*Id.*)

Brothers noted that Dr. Agre at IMPACT Physical Medicine and Aquatic Center would specify Nelson's future work restrictions and that Nelson should follow up with the clinic after her therapy sessions were complete. (AR 353.)

In August 2009, during Nelson's first round of physical therapy, she returned to Brothers complaining of cold symptoms and increased back pain. (AR. 347.) Nelson reported that she was bedridden all weekend due to her back pain but was "not really sure what her triggers are." (*Id.*) Nelson indicated that the physical therapy seemed to be helping, but relief from pain was temporary. (*Id.*) Brothers physical examination revealed "generalized tenderness" to palpate the lumbar paraspinals as well as the left PSIS, right PSIS and SI joint. (*Id.*) Brothers referred Nelson to Aspen Orthopedics for further evaluation. (AR. 348.)

In October 2009, Nelson returned to see Brothers and expressed concern about her ability work within the restrictions given by the Midwest Spine Institute. (AR. 462.) Specifically, she was unsure of her ability to lift, carry, push and/or pull 10-15 pounds. In fact, Nelson was concerned about finding any job given her current physical limitations. (*Id.*) She reported that she could sit for no more than 10 or 15 minutes at one time; required assistance to get out of the bathtub after bathing; was having trouble sleeping; could walk only two or three blocks at a time before resting; and did minimal lifting. (*Id.*) Brothers' physical exam revealed ongoing tenderness in Nelson's lumbar back. (*Id.*) Brothers did not change Nelson's work restrictions, but consulted with Midwest Spine about the possibility of completing a functional-capacity evaluation. (AR. 463.) Brothers indicated to Nelson

that any adjustment to her work restrictions would be made by Midwest Spine. (*Id.*)

### 2. Dr. Mark Agre

Dr. Agre is a M.D., M.S. at IMPACT Physical Medicine and Aquatic Center. Following Brothers' referral, he completed a patient intake assessment of Nelson in July 2009. (AR. 376-378.) Nelson reported her pain was at the highest level, a 10. Dr. Agre noted her Oswestry pain score was 56 %, which indicates "severe disability."[3] Dr. Agre noted that Nelson had difficulty standing, walking and laying supine. He also noted that she could sit for only 20 minutes before needing to change positions. Dr. Agre concluded that Nelson was hyperlordotic[4] and suffered from chronic pain syndrome. (AR 374.) He also noted that she "almost certainly" has facet degenerative changes, even though it was not noted on her x-ray. (*Id.*) Dr. Agre recommended physical and occupational therapy to take pressure off Nelson's facets and instructed Nelson to follow up in six to eight weeks. (*Id.*) At this time, Dr. Agre noted that Nelson could complete seated sedentary work that allowed for frequent position changes and light weight-lifting. (*Id.*)

Nelson saw Dr. Agre again in mid-November, four months after their initial consultation. (AR. 458-59.) Nelson was still experiencing low back pain and Dr. Agre observed that the MRI of her back taken in late September "looked pretty good," except for the facet arthropathy at L4-5-S1. (*Id.*) On examination, Dr. Agre noted that the arthropathy was not the sole cause of Nelson's pain.

---

[3] The Oswestry Disability Index is a condition-specific outcome measure used in the management of spinal disorders. Scores between 40-60% are interpreted as "severe disability" whereby pain is the main problem, but the patient's daily activities are also limited. *See* Michael Vianin, *Psychometric Properties and Clinical Usefulness of the Oswestry Disability Index,* 7 J Chiropr Med. 161-163 (2008).

[4] Extreme abnormality in the curvature of the lumbar and cervical spine. <u>Dorland's Illustrated Medical Dictionary</u>, 796 and 960 (28th ed. 1994).

He suspected that her posterior elements were contributing to her pain level, and recommended they be further examined by Dr. Lutz, a specialist in that area. Dr. Agre specifically noted that surgery was not necessary and recommended Nelson continue her occupational therapy sessions through December and follow-up with him in one month. (*Id.*) Dr. Agre opined that Nelson was "still pretty disabled for the county" and that she "[could] not exceed 15 hours [of] work per week yet." (*Id.*)

Dr. Agre prescribed a cane for Nelson on January 4, 2010.[5] (AR.604.) Later in January, Nelson had a follow-up appointment with Dr. Agre. It was noted that Nelson "continu[ed] to make progress" in her occupational therapy sessions, 11 of which she had completed. (AR. 510.) Dr. Agre recommended she complete a total of 16-18 sessions, and then return to him for another follow up. (*Id.*) In addition, Dr. Agre reviewed the results of a brain-scan MRI completed several weeks prior that he thought might reveal the cause of Nelson's persistent feeling of numbness. (*Id.*) The scan revealed atypical findings, namely that Nelson had "scattered nonspecific findings not typical for multiple sclerosis." The neuroradiologist recommended a gadolinium-enhanced MRI be completed in 4-6 months. (AR. 511.)

The following month, in February 2010, Nelson underwent cervical and thoracic MRI studies. (AR. 513-515.) Mild degeneration was observed in both areas. (AR. 514.) On March 31, 2010 Nelson saw Dr. Agre for another follow up. (AR. 508-509.) Nelson had completed 19 therapy sessions at the time but was still experiencing pain. (AR. 508.) Dr. Agre recommended she continue with six more therapy session before seeing him again. (*Id.*) Dr. Agre continued to believe that Nelson's posterior elements were her "substantial pain generators for her lumbar spine." (*Id.*) In June,

_____

[5] The cane prescription was recommended by occupational therapist Susan Morris who completed a functional capacity evaluation on Nelson in December 2009.

Nelson saw Dr. Agre again and reported pain in her right arm. (AR. 506.) Dr. Agre noted that a previous nerve conduction study on the right arm was normal and that her cranial imaging was stable. (*Id.*) Dr. Agre recommended Nelson continue with her occupational therapy sessions through July, at which point it was recommended she join a health club or continue with an independent program. (AR 507.) In October, Nelson returned to see Dr. Agre, complaining of chronic low back pain and discomfort in her right knee. Nelson reported that the pain in her right arm had "improved substantially" with therapy, but that her right knee was bothering her again. (*Id.*) She indicated that the steroid injection received last year helped relieve her pain and agreed to have another injection administered at the visit. (*Id.*) Dr. Agre recommended she also continue her therapy program. (AR. 508.)

Three months later, in January 2011, Nelson returned to see Dr. Agre. Her condition was mostly the same, with ongoing complaint of pain in her right knee. (AR. 502.) Nelson reported being involved in a recent car accident, which seemed to flare her condition. (*Id.*) She was using a single point cane to ambulate. (*Id.*) Nelson was scheduled to receive orthodic shoe inserts to better align her knees and lumbar/hips. (*Id.*) On the same day, Dr. Agre competed an Orthopedic / Pain Questionnaire for Nelson at the request of her attorneys. (AR. 495-496.) Dr. Agre concluded that Nelson was capable of working in a low stress environment, with the following conditions and restrictions:

- ability to shift positions every 15 minutes (sitting, standing, walking);
- ability to use her cane when walking;
- ability to take unscheduled breaks over the course of an eight-hour work day;
- ability to miss about three days of work per month as a result of her impairments or for treatment;
- "never" lift 10-50 pounds;
- "rarely" lift 1-10 pounds;
- "never" crouch, squat or climb ladder;
- "rarely" twist her lower back, stoop or climb stairs;
- "significant limitations" with handling and fingering. (*Id.*)

### 3. Dr. Stefano Sinicropi

Dr. Stefano Sinicropi is a spine specialist at the Midwest Spine Institute. In September 2009, Nelson saw Dr. Sinicropi and Jacob Guth, a physician's assistant, at the Midwest Spine. (AR. 385-392.) Nelson reported she suffered from chronic low back pain since 1999 and numbness in her right lower extremity began for the past year. (*Id.*) Nelson said that she was attending physical therapy and received injections in her knee, but neither helped relieve the numbness in her right leg or her low back pain. (*Id.*) Examination of Nelson's lumbar spine and lower extremities revealed tenderness over the lumbar paraspinous muscles, but a normal condition of the SI joints and greater trochanters. (AR. 387.) Her range of motion was limited 50% in all directions, but she demonstrated full hip range of motion. (*Id.*) Dr. Sinicropi and PA Gruth concluded Nelson's diagnosis was "low back pain with right lower extremity dysesthesia."[6] (AR. 388.) It was noted that she might also be suffering from sacroilitis.[7] (*Id.*)

At the end of September, an MRI was done and revealed mild facet arthropathy[8] and slightly low-lying conus medullaris extending to the superior endplate of L3. (AR. 380.) The MRI revealed no evidence of tethered cord or spinal canal lipoma and was also negative for spinal stenosis, foraminal stenosis or disc herniation at any level. (*Id.*) One week later, Nelson followed up with physician assistant Guth to review her MRI results. His physical exam revealed that Nelson was "exquisitely tender" over her SI joints and "mildly tender" over the lumbar paraspinous muscles.

---

[6] An unpleasant, abnormal sensation produced by normal stimuli. Dorland's Illustrated Medical Dictionary, 515 (28th ed. 1994).

[7] Inflamation of the sacroiliac joint. Dorland's Illustrated Medical Dictionary, 1479 (28th ed. 1994).

[8] Arthritis in the facet joints. Dorland's Illustrated Medical Dictionary, 141 (28th ed. 1994).

(AR. 410). In light of the MRI results, it was recommended that Nelson receive bilateral SI joint injections and also complete physical therapy to address her pelvic dysfunction, her mild degenerative disease and facet arthropathy. (*Id.*)

In mid-October, after one direct physical consultation with Nelson, Dr. Sinicropi completed a request for medical information from the Minnesota Family Investment Program. (AR. 471-472.) Dr. Sinicropi indicated that Nelson's diagnosis was back pain with possible sacroilitis and, contrary to Brothers' and Agres' findings, opined that she could complete "moderate" duty jobs for a minimum of 20-35 hours per week as long as she did not have to lift, pull or push more than 20 pounds. (*Id.*)

### 4. Dr. Aaron Mark

Dr. Mark is a state-agency medical consultant. Like Dr. Sinicropi, he offered an opinion on Nelson's abilities in October 2009 (AR. 395.) However, Dr. Mark did not physically examine Nelson. He gave his opinion based solely on her medical records. He opined Nelson's limitations included:

- ability to lift 10 pounds frequently;
- ability to lift 20 pounds occasionally;
- ability to stand/walk for two hours in an eight hour day;
- ability to sit for six hours in an eight hour day;
- unlimited ability to push and pull;
- "occasionally" climb ramps/stairs;
- "never" climb ladder, rope or scaffolds;
- "occasionally" balance, stoop, kneel, crouch and crawl. (*Id.*)

Dr. Mark acknowledged Brothers' previously assigned limitations but noted that she was "not a programmatically acceptable source." He also concluded that Brothers' restrictions were effective for four weeks only and that no other restrictions were assigned since then. (AR. 496.)

### 5. Ms. Susan Morris

Susan Morris is an occupational therapist at IMPACT Physical Medicine and Aquatic Center. On December 22, 2009, she conducted a functional capacity evaluation on Nelson. (AR.547-49.) At the beginning of her report, Morris noted Nelson appeared to give a "near full" but not entirely full effort during the evaluation. (AR. 547.) Morris wrote, "In describing sub-maximal effort, this evaluator is by no means implying intent. Rather, it is simply stated that Nelson can do more physically at times than was demonstrated during this testing day." (Id.) Nelson scored in very low percentiles on exams that measured her fine motor skills and hand dexterity. For example, she scored in the 14[9] percentile for assembly according to the Purdue Pegboard test[9] and in the 1st percentile for both the placing and turning portion of the Minnesota Rate of Manipulation Test.[10] In regard to Nelson's physical limitations, Morris recommended she be able to change positions frequently, with the ability to stretch throughout the day, as necessary. (AR. 549.) It was also recommended that Nelson not be required to crouch, squat or kneel for extended periods of time. (*Id.*) Morris also recommended use a single point cane and of a transcutaneous electrical nerve stimulation (TENS) device at home. (*Id.*) Finally, Morris recommended Nelson participate in vocational counseling in order to find a job compatible with her current physical limitations. (*Id.*)

### B. Nelson's Testimony

Nelson testified that she stopped working as a personal care assistant (PCA) in February 2009 because "I had to lift clients [and] I had a problem where I fell and wasn't able to do it anymore." (AR. 83.) Nelson also previously worked as a teacher's assistant, but she had to quit in 2006 because "I had to miss a lot of days, because I have a daughter who has disabilities" and also because "my

---

[9] The Purdue Pegboard test is used to assess fine motor skills. (AR. 547.)

[10] The Minnesota Rate of Manipulation test is used to assess one's ability to use their hands in a coordinated and efficient manner and to assess medium arm and hand dexterity. (*Id.*)

back had started really giving me problems because I had to do restraints with children . . . ." (AR. 83-84.) She also testified that she had experience working as an administrative assistant and other clerical jobs. (AR. 85.) Nelson confirmed that her alleged disability onset date was February 20, 2009 and that she had not applied for any jobs since that date. (*Id.*)

Nelson identified her back as her most significant impairment. (*Id.*) She testified that "I have degeneration of the back, and also arthritis. And some days are good. You know, some days I can move around and do a lot of things, and some days I can't." (AR. 86.) Nelson testified that her back problems and "her legs giving out" require her to use a cane. (*Id.*) She testified that she has been using a cane for almost two years. (AR. 79.) Nelson said she has to climb stairs in her home, three to enter and twelve to reach her upstairs bedroom. (AR. 81.) She climbs the stairs on a daily basis, but " I have to pause a lot. Sometimes it takes me a while." (AR. 81.)

Nelson testified that she normally cannot sit for more than 30 minutes without changing positions and that two hours is the maximum time she can sit at one time. (AR. 87.) She acknowledged that she recently drove for more than two hours without stopping to get to Chicago to be with her sister who was dying of cancer. (AR. 82.) Nelson testified that she "was kind of pushing it . . . trying to get there, because they told us that my sister didn't have long to live." (AR. 87.) She testified that she normally changes positions three or four times per hour while sitting. (AR. 95-96.) Nelson testified that she cannot stand for more than 20 minutes at a time, even with the assistance of her cane. (AR. 87.) She said she can walk "about two blocks" before needing to stop and rest. (AR. 87.) She testified that she could walk for a total of four to six hours in an eight hour day if given necessary rest breaks. (AR.88.) Nelson testified that she can lift no more than 10 pounds.

Nelson identified her right arm as her second greatest impairment. She testified that due to

a previous rotator cuff surgery she "still sometimes drop[s] things." (AR. 88.) Nelson identified her right leg as her third most severe impairment. She testified that "they said it's the . . . sciatic nerve. And I guess it just gets numb and then it just goes out." (AR. 90.) Nelson said depression was her next most severe impairment. She testified that "sometimes I don't even want to get out of bed, and when I do and if the pain is bad, I just really can't get out of bed, so it just gets even worse." (AR. 90-91.) Nelson said she gained about 40 pounds over the past several years because of her depression. (AR. 80.) "I eat a lot when I'm depressed. I do. That's what I do." (*Id.*) Nelson also testified that she has anxiety attacks and that it's "hard for me to stay focused on a lot of things." (AR. 91.) She also testified that "they say I suffer from detachment . . . some detachment disorder." And, "they say I have some personalities . . . disorder." (AR. 92.)

In regard to household duties, Nelson testified that she usually tries to cook dinner, but that "a lot of times we eat . . . out." (AR. 101.) She testified that her 16-year-old son usually brings the laundry downstairs for her to wash. Nelson also testified that "sometimes I do vacuuming. It just depends on how I'm feeling." (*Id.*) In regard to her own personal care, Nelson testified that she only takes showers because she got stuck in the bathtub one time for more than 6 hours. (AR. 102, 86.) "That was in July of 2009. And that was the most humiliating thing that ever happened to me." (AR. 86.) Nelson testified that she is able to dress herself and go to the bathroom without assistance. (AR. 102.) She also testified that her 16-year-old son is self-sufficient and that her 7-year-old daughter, who is disabled, has a personal care attendant who comes three times a week to assist with her care. (*Id.*)

## C. Vocational Expert's Testimony

The ALJ posed three hypothetical questions to the vocational expert. The first hypothetical

assumed a person with the following residual functional capacity ("RFC"):

- ability to lift 10 pounds frequently;
- ability to lift 20 pounds occasionally;
- ability to stand/walk for two hours and sit for six hours in an eight hour day;
- ability to frequent push, pull and/or operate foot pedals with the right lower extremity;
- "occasionally" climb ramps/stairs;
- "never" climb ladder, rope or scaffolds;
- "occasionally" balance, stoop, kneel, crouch and crawl;
- required sit-stand option, at will. (AR. 110.)

The vocational expert testified that a person with this hypothetical RFC could perform Nelson's past

relevant work, namely her work as a receptionist and her work doing data entry, assuming the latter

provided a stand-sit option. (*Id.*)

The second hypothetical assumed a person with the same limitations as the first hypothetical,

but with the following additional limitations:

- simple, routine repetitive tasks, with occasional and superficial contact with others;
- not faced-paced;
- no strict time quotas.

The vocational expert testified that a person with this RFC could not perform Nelson's previous

relevant work because her previous jobs "went beyond simple and routine." (AR. 111.) However, the

vocational expert identified sedentary assembly work and other unskilled jobs like an optical goods

worker that could be performed by someone with this RFC.

The third hypothetical assumed a low stress job with the following limitations:

- ability to walk only one or two blocks at a time;
- ability to sit and stand for only 15 minutes at a time;
- ability to stand and walk a total of two hours in an eight hour day;
- ability to sit for four hours in an eight hour day;
- ability to change positions at will;
- use of a cane for standing and walking;
- ability to take one or two unscheduled breaks during the day;
- "rarely" lift or carry less than 10 pounds;
- "rarely" twist lower back, stoop or climb stairs;

- "never" crouch, squat or climb ladders;
- "occasionally" look down and turn their head to look up and to also hold their head steady;
- "occasionally" reach, handle and finger;
- miss three days of work per month.

The vocational expert testified that the restrictions posed in the third hypothetical would eliminate competitive employment for a person with that RFC.

After responding to the ALJ's three hypothetical questions, Nelson's attorney asked if a person with Nelson's fine motor coordination test results (14th percentile in both hands according to the Purdue pegboard) would be able to do any of the assembly jobs previously mentioned by the vocational expert. The vocational expert testified "probably not." (AR. 114.) Her attorney also asked if all of the jobs mentioned under the first two hypotheticals would be available to an employee who had to miss three days of work per month. The vocational expert testified "not if it was a routine occurrence, no." (AR. 115.)

**D.     ALJ's Decision**

To determine whether Nelson was disabled, the ALJ followed the five-step sequential process established by the Social Security Administration, outlined in 20 C.F.R § 404.1520. The ALJ first determined that Nelson had not engaged in substantial gainful activity since the date of her alleged onset of disability.

At the second step, the ALJ found Nelson to have the following "severe" impairments: lumbar spine degenerative disc disease, cervical spine degenerative disc disease with spinal stenosis, thoracic spine degenerative disc disease, chronic pain syndrome, mild medical and patellofemoral compartment chondromalacia and arthritis, obesity, major depressive disorder, generalized anxiety disorder, posttraumatic stress disorder and depressive personality disorder with self-defeating borderline personality characteristics.

14

At the third step, the ALJ concluded that Nelson's impairments did not meet the requirements under any listed impairments described in Appendix 1 to Subpart P, Regulations No. 4. (AR. 20.) At the fourth step, the ALJ determined that Nelson had an RFC to perform sedentary work with the following limitations:

- ability to lift and carry 20 pounds occasionally, 10 pounds frequently;
- standing and/or walking for two hours and sitting for six hours in an eight-hour work day;
- never climb ladders, ropes or scaffolds;
- occasionally climb ramps and stairs; balance, stoop, kneel, crouch and crawl;
- ability to push/ pull or operate foot pedals with lower right extremity frequently;
- avoid moderate exposure to hazards such as working around dangerous moving machinery;
- no work at unprotected heights;
- an "at will" stand / sit option;
- perform simple, routine and repetitive tasks;
- occasional and superficial contact with others;
- work environment of normal or average production;
- no fast-paced production environments with strict time quotas. (AR. 22.)

At step five, the ALJ concluded that Nelson was unable to perform her past relevant work, but that she could perform jobs such as an assembly worker or optical goods worker. (AR. 30.) Because these jobs existed in significant numbers in the national economy, the ALJ found that Nelson was not disabled. (AR. 30.)

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 220 (1938). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488

(1951). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.*

## IV. CONCLUSIONS OF LAW

**A. The ALJ's RFC determination is not supported by substantial evidence.**

Nelson claims that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to (1) properly weigh the medical opinions in her record (2) sustain its burden of proof that she could perform the duties of jobs specified by the vocational expert; and finally (3) properly consider her obesity.

> **1. Substantial evidence does not support the weight assigned by the ALJ to medical opinions in Nelson's record.**

Nelson contends the ALJ failed to properly weigh the opinion of her treating physician, "other sources," and a consultative psychologist. Nelson also argues the ALJ erred in giving the most weight to the opinion of a non-examining and non-treating physician in determining her RFC. The Court agrees.

A claimant's RFC determination is to be "based on all the relevant medical and other evidence in [the] record." 20 C.R.F. § 404.1520(e). This includes medical records, observations of treating physicians and others, and an individuals own description of their limitations. *Mckinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). The opinion of one's treating physician must be given controlling weight if it is supported by medical evidence and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). The opinion of those deemed "other sources" are "important and

should be evaluated on key issues such as impairment severity and functional effects [...]." SSR 06-3p. This is especially true today because "other sources" increasingly perform treatment and evaluation functions previously reserved to physicians. (*Id.*) The opinion of non-examining and non-treating physicians generally do not constitute substantial evidence on which an ALJ can assess an RFC, unless the ALJ identifies and explains the insufficiency of treating source opinions. 20 C.F.R. § 404.1527(d)(2); *E.g. Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999);).

### a. The ALJ failed to give proper weight to the opinion of Nelson's treating physician, Dr. Agre.

Nelson contends that the ALJ erred by giving only "little weight" to the opinion of her treating physician, Dr. Agre. The ALJ concluded that Dr. Agre's medical opinion deserved little weight because (1) it was "not supported by evidence of record" and (2) the limitations prescribed by Dr. Agre "contrast sharply with the credible portion of the claimant's daily activities." (AR. 29.) These conclusory reasons–without further explanation– are insufficient to justify giving Dr. Agre's opinion "little weight."

A treating physician's opinion is generally given controlling weight because treating sources are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimants] medical impairments and may bring a unique perspective to the medial evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations. . . ." 20 C.F.R. § 416.927(d)(2). Regardless of whether the ALJ grants a treating physician's opinion substantial or little weight, "an ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel,* 201 F. 3d 1010, 1012-13 (8th Cir. 2000). Specifically, when giving a treating physician's opinion less than controlling weight, an ALJ must consider the 20 C.F.R. § 404.1527(d)

factors. These include: (1) the length and frequency of the relationship; (2) the consistency of the opinion with other evidence; (3) the degree of support provided for the opinion; (4) the quality of the explanation provided for the opinion (5) the source's specialization; (6) any other factors that support or detract from the opinion. 20 C.F.R. § 404.1527(d); SSR 06-03p; *E.g.*, *Dew v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 75049 at *55 (D. Minn. July, 26, 2010).

Dr. Agre is one of Nelson's treating physicians and an acceptable medical source because he provided Nelson treatment on an ongoing basis and is a licensed physician. 20 C.F.R. §§ 416.902; 404.1513; (AR. 369-378; 458-59; 495-496; 499-500; 502-511; 604.) In January 2011, after nine consultations with Nelson over a two year period, Dr. Agre opined that Nelson was capable of work in a low stress environment with the following limitations:

- ability to shift positions every 15 minutes (sitting, standing, walking);
- use of cane when walking;
- ability to take unscheduled breaks over the course of an eight-hour work day;
- ability to miss about three days of work per month as a result of her impairments or for treatment;
- "never" lift 10-50 pounds;
- "rarely" lift 1-10 pounds;
- "never" crouching, squatting or climbing ladder;
- "rarely" twisting her lower back, stooping or climbing stairs;
- "significant limitations" with handling and fingering. (AR. 495-496.)

Based on these limitations, Nelson would be unable to secure competitive employment according to the vocational expert's testimony. (AR. 114-115.)

The Commissioner argues that the ALJ was correct in assigning Dr. Agre's opinion little weight because: (1) Dr. Agre's 2009 assessment was consistent with the ALJ's RFC; (2) Dr. Agre's 2011 opinion is not based on any "objective evidence"; and (3) Nelson's daily activities contrast with

Dr. Agre's recommendations.

First, the Commissioner's argument that Dr. Agre's July 2009 opinion was "entirely consistent with the sedentary work the ALJ found Plaintiff could perform" is not supported by the record. (Def. Br. 23.) Dr. Agre's 2009 intake of Nelson included the following findings: an Oswestry pain score of 56%; difficulty standing, walking and laying supine; ability to sit for only 20 minutes before needing to change positions. Dr. Agre specifically noted "Paperwork for the county filled out that really she can find seated sedentary type work with frequently position change and light weights." (AR. 374.) Sedentary work is defined as work that involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools." 20 C.F.R.§ 404.4567. In contrast, the ALJ's RFC concludes that Nelson is able to lift and carry 20 pounds occasionally and 10 pounds frequently. (AR. 22.) Thus, Dr. Agre's 2009 opinion and the ALJ's RFC differ significantly.

Next, the Commissioner argues that Dr. Agre's opinion "lack[s] any objective support." (Def. Br. 24.) The definition of "objective medical evidence" includes "symptoms, signs, and laboratory findings." 20 CFR §§ 404.1529, 404.1528. Symptoms are the claimants own description of their physical or mental impairment(s); signs are anatomical, physiological, or psychological abnormalities which can be observed, and must be shown by medically acceptable clinical diagnostic techniques; and laboratory findings are anatomical, physiological, or psychological phenomena. 20 CFR § 404.1528 (a), (b) and (c). When considered in its entirety, there is ample objective medical evidence in Nelson's file on which Dr. Agre based his 2011 recommendations. For the two year period between March 2009 and April 2011, Nelson sought medical attention at least twenty times. Symptoms were expressed by Nelson dozens of times, signs were well documented by Dr. Agre's

treatment notes, and laboratory findings in the form of MRI's and x-rays were also well-documented. (AR. 369-378; 458-59; 495-496; 499-500; 502-511; 604.).

The Commissioner also argues that Dr. Agre's 2011 opinion is not based on any objective medical evidence because Dr. Agre "did not cite any clinical findings" in support of his assessed restrictions. (DSJB 24). In fact, the third instruction on the Orthopedic / Pain Questionnaire filled out by Dr. Agre in 2011 instructed him to "Identify the clinical findings . . . that support your patient's medical impairments." (AR. 495.) Dr. Agre noted multiple MRI's and x-rays in the space provided.[11] Thus, Dr. Agre did cite clinical findings in support of his 2011 limitations.

The Commissioner further argues that review of Dr. Agre's treatment notes provides "no support" for his "extreme limitations." This is not true. Dr. Agre's first examination of Nelson in July 2009 led him to conclude that she was limited to sedentary work with frequent position changes and light weights. (AR. 376-378). During his November 2009 consultation with Nelson, Dr. Agre reviewed an MRI of her back and concluded that it "looked pretty good . . . except for the facet arthropathy at L4-5-S1." Review of her symptoms included foot swelling, chronic low back pain, sleeping problems and sharp pain down her right leg. Dr. Agre's examination notes include "hyperlordotic . . . extension, rotation/extension very sharp focal L4-5-S1 and . . . pain on flexion . . ." Dr. Agre concluded that she "was still pretty disabled for the county" and that she "[could] not exceed 15 hours of work per week yet." (AR.458.) Notably, this conclusion is even more limiting than Dr. Agre's January 2011 opinion. Over the course of the next year, Dr. Agre saw Nelson once every three months and maintained detailed treatment notes. (AR. 369-378; 458-59; 495-496; 499-500; 502-511; 604).

_____

[11] There are two sources noted by Dr. Agre that the Court is unable to read. (AR. 495.)

More specifically, the Commissioner argues that the "well-controlled" symptoms and "conservative treatment" of Nelson's right knee and low back are inconsistent with Dr. Agre's "extreme" limitations. It is true that Nelson did not require surgery. It is also true that the x-rays and MRIs of her low back and knee revealed mostly "mild" degeneration. However, these facts are not necessarily dispositive of Nelson's abilities. It is well established that certain pain syndromes may produce symptoms greater than the objective medical evidence alone would suggest. 20 C.F.R. 404.1529(c)(3). That is why the Commissioner pledges to examine the totality of the evidence in a claimant's file, including the statements of the claimant, the opinion of the treating physician, and more. SSR 96-7p; *Williams v. Astrue*, 2011 U.S. Dist. LEXIS 143700 at *15 (D.S.C. Oct. 14, 2011).

Finally, the Court fails to see how Nelson's daily activities stand in sharp contrast to Dr. Agre's January 2011 opinion. First, the ALJ and the Commissioner highlight the fact that Nelson drove from Minneapolis to Chicago without stopping several weeks prior to the hearing. (AR. 24.) However, both fail to provide the context for Nelson's drive to Chicago. As Nelson testified, she made this trip to see her sister who was dying of cancer and, according to her doctors, did not have long to live. (AR. 82.) The Commissioner also argues that Nelson's "motherly duties" for her disabled seven-year old daughter stand in contrast to Dr. Agre's recommendations. However, nothing in the record indicates Nelson must exceed the Dr. Agre's recommended limitations in order to adequately care for her daughter. The record makes clear that Nelson's daughter is at school during the day and receives assistance from a PCA three days per week. (AR 101-102.)

The Commissioner also argues that Nelson's ability to climb stairs in her home on a daily basis "tends to undermine her claim." But Nelson testified that she has to pause when climbing the 12 stairs to her bedroom and that "sometimes it takes me a while." (AR. 81.) Finally, it is argued that

Nelson's non-compliance with part of her physical therapy schedule gives weight to the idea that "the symptoms may not have been as limiting as the claimant has alleged." (Def. Br. 27, 28.) This assertion is underdeveloped. There are innumerable reasons why Nelson might have missed some of her appointments, including a worsening of her symptoms. The ALJ had the opportunity to ask Nelson about these missed appointments at the hearing, but did not.

Because the ALJ failed to explain his reasons for giving Dr. Agre's opinion "little weight" the Court remands with instruction for the ALJ to fully consider the 20 C.F.R. § 404.1527(d) factors in determining the weight granted to Dr. Agre's opinion.

> **b.      The ALJ failed to properly weigh the opinion of "other source" medical professionals in Nelson's file.**

Nelson contends that the ALJ erred in giving only "little weight" to the opinion of two medical professionals who are considered "other sources" under the social security regulations. These include Susan Morris, a licensed and registered occupational therapist who administered a functional capacity evaluation on Nelson, and Dawn Brothers, a physician's assistant who served as Nelson's primary care-giver. The ALJ concluded that Morris and Brothers' opinions could not be considered because they were not "acceptable medical sources."

The Social Security Administration (SSA) regulations distinguish between "acceptable medial sources" and "other sources." 20 C.F.R. §§ 404.1513(a) and 404.1513(d). Acceptable medical sources include licensed physicians, psychologists, optometrists, podiatrists and qualified speech therapists. 20 C.F.R. § 404.1513(a)(1-5). Other medical sources include nurse-practitioners, physicians' assistants, therapists and more. 20 C.F.R. § 404.1513(d)(1)-(4). This distinction is important for a few reasons. First, a medically determinable impairment can only be based on evidence from an acceptable medical source. 20 C.F.R. § 404.1513(a); SSR 06-03p. Second, only acceptable medical

sources can give "medical opinions." 20 C.F.R. § 404.1527(a)(2). Finally, only medical opinions from acceptable medical sources are entitled to controlling weight. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, once a medically determinable impairment is established, information from "other sources" may "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p; *E.g.*, *Sloan v. Astrue*, 499 F. 3d 883, 888-889 (8th Cir. 2007).

To determine the weight assigned to the opinion of "other sources," the ALJ should consider the same factors used to determine the weight granted to the opinion of acceptable medical sources, as discussed in section (a). SSR 06-03p; 20 C.F.R. § 404.1527(d). After weighing these factors, it is possible that an opinion from a medical source who is considered an "other source" may outweigh the opinion of an acceptable medical source. SSR 06-3p; *Barros v. Astrue*, 2011 U.S. Dist. LEXIS 63937 at *27, (D. Minn. June 7, 2011). Finally, when opinions from "other sources" might have an affect on the outcome of a case, the adjudicator "generally should explain the weight given . . . or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-3p. When opinion evidence from "other sources" is not properly considered, remand is appropriate. *Halverson v. Astrue*, 2009 U.S. Dist. LEXIS 6080 at *38-39 (D. Minn. Jan. 5, 2009).

In its decision, the ALJ explained that it assigned Morris' opinion little weight because she is not an acceptable medical source. (AR. 28.) This reason is inadequate. Although it is true that a medically determinable impairment must be based on the opinion of acceptable medical sources, once such an impairment is found, the opinion of "other sources" in the claimant's record must be considered when determining an individual's RFC. 20 C.F.R.§ 404.1513(a); SSR 06-03p; *Gordon*

*v. Astrue*, LEXIS 54193 at \*10-11 (W.D. Mo. June 2, 2010). The ALJ purportedly considered Morris'

statement and "incorporated a sit/stand option into the RFC. . . ." (AR. 28.) If this is true, then it is

unclear why other aspects of Morris evaluation were not incorporated in the RFC. Notably, Morris'

evaluation is the only functional capacity exam administered by a medical professional in Nelson's

file. According to the vocational expert's testimony, the limitations observed by Morris would

prevent Nelson from securing employment. (AR. 114-117.) Because Morris's observations were

potentially dispositive of Nelson's claim, the ALJ should have provided a comprehensive explanation

as to how the entirety of her opinion was weighed and factored into Nelson's RFC. *See* 20 C.F.R §

404.1527(d).

With respect to Brothers, the ALJ also reasoned that her opinion deserved little weight

because she was "not an acceptable medical source." Again, this reason is inadequate. The only

additional reason given for dismissing Brothers opinion was that "the limitations she noted were only

for four weeks following June 16, 2009." The ALJ misinterpreted this temporal limitation.[12] The four

week time frame is included within the following sentence: "No frequent bending, no lifting from the

floor level for the next four weeks." (AR. 353.) Thus, the one-month time restriction only applies to

the limitation on Nelson's bending and lifting, not the entirety of the restrictions given by Brothers.[13]

The ALJ also stated that he "considered the information provided by Brothers to . . . understand how

the individual's impairments affect her ability to work." However, it is unclear how this is so because

---

[12] Non-examining physician Dr. Aaron Mark also misread this temporal limitation in his October 2009 review of Nelson's medical file. (AR. 396.) The ALJ seems to have adopted Dr. Mark's error. (AR. 28.)

[13] The other work restrictions given by Brothers included: a time limitation of no more than 4 hours per day; a lifting restriction of no more than 10 pounds; no standing or sitting for longer than 20 minutes at a time.

the ALJ's RFC exceeds the limitations recommended by Brothers in every meaningful way. (Compare AR. 22 and 350.) Further explanation is required.

The Commissioner raises several additional arguments in support of the ALJ giving Brothers' and Morris' opinions little weight. The arguments include: (1) the opinions are not supported by the overall record; (2) the opinions conflict with the opinion of some acceptable medical sources and (3) the observation by Morris that Nelson may not have been giving her full physical effort during the exam "undermine[d]" the validity of Nelson's recommendations. (Def. Br. 20, 23.)

Upon review of Nelson's record in its entirety, these arguments are not persuasive. For example, the Commissioner argues that Brothers' assessment of Nelson's capabilities "seems entirely based upon Plaintiff's subjective complaints." (Def. Br. 21.) In fact, Brothers examined Nelson three times and reviewed MRI and x-ray results prior to assigning her work restrictions. (AR. 350-353.) And, while there are conflicting medical opinions expressed in Nelson's record that the ALJ must reconcile, Morris and Brothers' opinions are consistent with the majority of opinions expressed in the record, including that of Nelson's treating physician. (AR. 353, 495, 547.) In regard to Morris' opinion, the Commissioner highlights that she performed a one-time evaluation and that the results are not trustworthy because Nelson may not have been giving her full effort during the evaluation. The Court agrees that Morris' cautionary note regarding Nelson's effort during the exam must be considered. However, the ALJ must still give good reasons for discounting these opinions. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). Specifically, the ALJ must provide an explanation that allows the Court to follow its reasoning. SSR 06-3p. The ALJ has not done so.

Because the ALJ dismissed the opinion of Brothers and Morris based on an erroneous interpretation of 20 C.F.R 1527 and failed to properly address the § 404.1527(d) factors in weighing

their opinions, the decision must be remanded.

### c. The ALJ failed to consider Dr. Hoistad's opinion.

Nelson contends that the ALJ failed to properly consider the opinion of consultative psychologist, Dr. Hoistad, because the ALJ did not identify the weight given to his opinion. (Pl.'s Memo. 26.) An ALJ is obligated to consider and weigh every medical opinion in a claimant's file, unless controlling weight is given to the opinion of the claimant's treating physician's. 20 C.F.R. § 404.1527(c). Here, the only reference made by the ALJ to Dr. Hoistad's opinion was the conclusion that Hoistad's finding of a GAF 40 score was "inconsistent with his medical status examination findings." (AR. 27.) This explanation is insufficient pursuant to the 20 C.F.R. § 404.1527(c)(1)-(6) factors that are to be considered when weighting medical opinion evidence. On remand, the ALJ should properly apply these factors and specify the weight given to Dr. Hoistad's opinion.

### d. The ALJ erred in giving the most weight to non-examining physician, Dr. Mark and non-treating physician, Dr. Sinicropi, in determining Nelson's RFC.

Nelson contends that the ALJ erred by giving the most weight to the opinion of Dr. Mark, a non-examining physician, in determining her RFC. The ALJ acknowledged that the opinion of non-examining physician's "[do] not as a general matter deserve as much weight as those of examining or treating physicians" but concluded that Dr. Mark's opinion deserved significant weight because it was based on objective medical evidence, was consistent with the credible portions of Nelson's daily activities and was not directly contradicted by any treating source. (AR. 28.) The Court disagrees.

The ALJ is correct that, in general, the opinion of non-examining physicians should be given

less weight than the opinion of a treating source. 20 C.F.R. § 404.1527(c)(1). Also, the opinion of non-examining physicians generally does not constitute substantial evidence. *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000); *Kuhl v. Astrue*, 2012 U.S. Dist. LEXIS 133932 at *16 (W.D. Mo. Sept. 19, 2012). This is particularly true when such opinions differ from the opinion of one's treating physician. *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001). Still, an ALJ may adopt the opinion of a non-examining or consultative physician if a treating physician's opinion is conclusory, not supported by medical evidence, or if the ALJ's determination is supported by substantial evidence in the record as a whole. *Piper v. Astrue*, U.S. Dist. LEXIS 114345 *50-51 (D. Minn. July 15, 2008).

Dr. Mark is a state-agency medical consultant who completed a RFC assessment form after reviewing Nelson's medical records in October 2009. The ALJ made several errors in considering Dr. Mark's opinion. First, the ALJ incorrectly concluded that Mark's opinion was not directly contradicted by any treating source. (AR. 28). Mark's opinion differs significantly from that of Dr. Agre and Brothers. (Compare AR. 395, 495 and 353.) This error is not merely a harmless error, as argued by the Commissioner, because the difference between the opinions is significant enough to alter the outcome of the ALJ's disability finding in this case. (Def. Br. 29, fn 12). Further, Dr. Mark made several errors in his assessment and the ALJ adopted them into its opinion. (AR. 394-396.) As discussed in section (a), Dr. Mark misread the temporal limitation on the work restrictions assigned by Brothers. Dr. Mark also opined that no other restrictions were set between Brothers June 2009 assessment and his review. In fact, Dr. Agre opined work restrictions for Nelson after his first consultation with her in July 2009, three months before Dr. Mark's review (AR. 374). Finally, it should be noted that because Dr. Mark's opinion was given in October 2009, his opinion did not consider nearly two years of Nelson's medical records.

The Commissioner argues that Dr. Mark's opinion was properly relied on by the ALJ because it is consistent with Dr. Sinicropi's opinion. This reason is inadequate for several reasons. First, the Commissioner incorrectly identifies Dr. Sinicropi as a "treating" physician. The record indicates that Dr. Sinicropi examined Ms. Nelson only one time, in September 2009. (AR. 385.) The rest of Nelson's appointments at Midwest Spine were conducted by PA Guth. (AR. 385, 389-398; 410, 469-470). This classifies Dr. Sinicropi as a non-treating source. 20 C.F.R. § 416.902. Further, the ALJ gave Sinicropi's opinion "some weight" because "it is supported by evidence of record." Yet, Sinicropi did not provide any details or explanation for his conclusions on the fill-in-the-blank RFC form he completed. Finally, like Dr. Mark's opinion, Dr. Sinicropi's opinion was given in October 2009, and thus did not consider a large portion of Nelson's medical record. In short, substantial evidence does not support the ALJ giving more weight to the opinions of Dr. Mark and Sinicropi over the opinion of Nelson's treating physician and other medical sources.

**2. The ALJ failed to show, by substantial evidence, that Plaintiff can perform jobs specified by the vocational expert.**

Because the vocational expert's testimony was based on a faulty RFC determination, the Commissioner has not proven by substantial evidence that Nelson can perform the jobs identified by the vocational expert.

**3. The ALJ properly considered Nelson's obesity in determining her RFC.**

Nelson contends the ALJ failed to properly consider her obesity in determining her RFC. (Pl. Br. 30.) The Commissioner argues that the ALJ did not commit legal error for several reasons: (1) because the ALJ questioned Nelson about her weight; (2) the ALJ was generous in finding Nelson obese in the first place; and (3) the burden of proof lies with the Plaintiff to show that her obesity caused or contributed to her physical and mental impairments. (Def. Br. 34-35.)

In 1999, obesity was removed from the Listing of Impairments in 20 CFR, subpart P, appendix 1. SSR 02-01p. But obesity must still be considered throughout the five-step sequential evaluation. SSR 02-01p. At steps four and five, an assessment should be made "of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment over time." SSR 02-01p, para 8. However, the plaintiff bears the burden of proof regarding the effect of obesity on other identified impairments. 20 C.F.R.§§ 404.1512, 416.912.

Here, the ALJ included obesity as a severe impairment suffered by Nelson. (AR. 19.) The ALJ acknowledged SSR 02-01p and specifically recognized his obligation to consider obesity when determining the Plaintiff's RFC. (AR. 20.) Although the remainder of the ALJ's opinion is void of any explanation regarding whether or not Plaintiff's obesity contributed to her physical and mental limitations, no medical opinion in Nelson's record indicates that her obesity had an exacerbating effect on her impairments. And, when the ALJ asked Nelson about her obesity during the hearing, she did not indicate that her obesity exacerbated other impairments. Rather, Nelson indicated the reverse, that her depression contributed to her obesity because it caused her to "eat a lot." (AR. 80.) In other words, Nelson has not met her burden of demonstrating that her obesity complicates her other impairments. Substantial evidence supports the ALJ's decision to discount it.

## V. CONCLUSION

The Court concludes that the ALJ did not provide adequate reasons for giving little weight to the opinion of Nelson's treating physician and other sources. The ALJ also failed to properly weigh the opinion of consultative psychologist Dr. Hoistad. The Court further concludes that substantial evidence does not support the ALJ's reliance on the opinion of one non-examining

physician and one non-treating physician in determining Nelson's RFC. Consequently, the ALJ has not met its burden of proving Nelson could perform the jobs identified by the vocational expert. However, the Court does not find that the ALJ erred in its consideration of Nelson's obesity. On remand, the ALJ must fully consider the limitations opined by Brothers, Morris and Dr. Agre. If the ALJ disagrees with those limitations, he must provide specific, detailed reasons for doing so.

## VI. RECOMMENDATION

Based upon all the files, record, and proceedings herein**, IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (ECF. No. 13) be **GRANTED** in part and **DENIED** in part.

2. Defendant's Motion for Summary Judgment (ECF. No. 18) be **DENIED**;

3. The Commissioner's decision be **REVERSED** and the case be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation.


DATED: December 12, 2012                          *s/ Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **December 26, 2012**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.